PHILLIP A. TALBERT
United States Attorney
ADRIAN T. KINSELLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:22-CR-0173-KJM |
|---|---|
| Plaintiff, | UNITED STATES' SUPPLEMENTAL REPLY IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT (ECF NO. 31) |
| v. | |
| RAYKHEEM GUTHERY, | DATE: March 20, 2023 |
| Defendant. | TIME: 9:00 a.m. |
| | COURT: Hon. Kimberly J. Mueller |

## I.   INTRODUCTION

This matter is currently set for a status conference on March 20, 2023.  ECF No. 45.  Two defense pretrial motions are pending.  ECF Nos. 31 and 33. The defendant's motion to dismiss the indictment (ECF No. 31) argues that 18 U.S.C. § 922(g)[1] is unconstitutional under the test articulated by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  On February 3, 2023, the defendant filed a supplemental reply arguing that the Fifth Circuit's recent ruling in *United States v. Rahimi* was persuasive authority in support of his motion to dismiss the indictment.  ECF No. 43; No. 21-11001, 2023 U.S. App. LEXIS 2693 (5th Cir. Mar. 2, 2023).  As authorized by this Court's minute order at ECF No. 45, the United States herein respectfully submits its supplemental response to the defendant's supplemental reply.

---

[1] The defendant is charged with a violation of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1), and a related violation of being a prohibited person (by way of a domestic violence restraining order) in possession of ammunition 18 U.S.C. § 922(g)(8).  *See* Indictment, ECF No. 10.

UNITED STATES' SUPPLEMENTAL RESPONSE IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT         1

The defendant admits *Rahimi* is not binding, but argues it is "strongly persuasive." ECF No. 43 at 1. The United States disagrees with the Fifth Circuit panel's ruling in *Rahimi*, and the Attorney General has already publicly announced that the Department is seeking further review of the decision. *See* Press Release 23-136, Statement from Attorney General Merrick B. Garland Regarding *United States v. Rahimi*, Department of Justice Office of Public Affairs (Feb. 2, 2023), https://www.justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi. As detailed below, the *Rahimi* court erred in concluding that 18 U.S.C. § 922(g)(8) is inconsistent with our Nation's historical tradition of firearm regulations.

## II. SUPPLEMENTAL ARGUMENT

In *Bruen*, the Supreme Court articulated the legal standard for reviewing Second Amendment claims. The Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," placing on the government the burden to "demonstrate" that a firearms regulation "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. This "historical inquiry … will often involve reasoning by analogy," in which courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2132. The Supreme Court warned that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 2133. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Id*. To justify a modern regulation, the government need "only … identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. (emphasis in the original).

To require modern gun regulations to have an exact 18th Century analogue would be to apply the very "regulatory straightjacket" *Bruen* warns against. The criminal code, especially as it relates to domestic violence, has evolved dramatically since the founding of this country. There is an obvious and troubling reason why statutes like 18 U.S.C. § 922(g)(8) and (g)(9) (which both deal with domestic violence) do not have historical twins: society treated domestic violence as a "private matter" until the early 1980s. *See, e.g.,* Joan Zorza, The Criminal Law of Misdemeanor Domestic Violence, 1970-1990,

83 J. Crim. L. & Criminology 46, 47 (1992) ("Throughout the 1970s and early 1980s, officers believed and were taught that domestic violence was a private matter, ill suited to public intervention."). As District Judge Irene Berger wrote in a post-*Bruen* decision upholding the constitutionality of 18 U.S.C. § 922(g)(9), a closely related statute,

> Laws surrounding domestic violence have evolved, in part as women's rights and roles in society expanded. The absence of stronger laws may reflect the fact that the group most impacted by domestic violence lacked access to political institutions, rather than a considered judgment about the importance or seriousness of the issue. … To suggest that only people convicted of crimes with an exact historical analogue can be subject to gun restrictions would lead to absurd results. The core question presented is whether the prohibition at issue would have been viewed as consistent with the Second Amendment in the founding era. Because the legal landscape surrounding crime and punishment was vastly different, the absence of an equivalent prohibition on firearm possession by people convicted of domestic violence offenses is not dispositive.

*United States v. Nutter*, 2022 U.S. Dist. LEXIS 155038, at *10–11. Judge Berger went on to conclude that §922(g)(9) "fits easily" within the framework of firearm regulations related to felons that "categorically disarmed groups whom they judged to be a threat to the public safety." *Id*. at *14 (*citing* now-Justice Amy Coney Barret's dissent in *Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019). Notably, Judge Berger agreed that the "surety laws cited by the United States establish that domestic violence was a concern in the founding era, and that laws designed to restrict the rights of those who committed such abuse, and protect the victims, were not viewed as controversial." *Id*. at *9.[2]

As to 18 U.S.C. § 922(g)(8), at least two other district courts have also agreed, post-*Bruen*, that it is also supported by this nation's history. *See United States v. Kays*, No. CR-22-40-D, 2022 U.S. Dist. LEXIS 154929 (W.D. Okla. Aug. 29, 2022); *United States v. Jordan*, No. 5:22-CR-339, at ECF No. 29 (W.D. Okla. Oct. 25, 2022). In *Kays*, for example, the district court held that 18 U.S.C. § 922(g)(8) was constitutional, post *Bruen*, for the same reasons that court had also upheld the constitutionality of 18 U.S.C. § 922(g)(9). *Kays*, 2022 U.S. Dist. LEXIS 154929, at *6–7 (W.D. Okla. Aug. 29, 2022) (citing

---

[2] Every other court to review the constitutionality of 18. U.S.C. § 922(g)(9) has agreed. *See United States v. Jackson,* No. CR-22-59-D, 2022 U.S. Dist. LEXIS 148911, at *3 (W.D. Okla. Aug. 19, 2022)(domestic violence misdemeanants can logically be viewed as "'relevantly similar to felons' who should be 'denied weapons for the same reasons.'"); *United States v. Anderson,* No. 21CR00013, 2022 U.S. Dist. LEXIS 189057, at *1 (W.D. Va. Oct. 17, 2022) (finding Section 922(g)(9) constitutional); *United States v. Bernard*, No. 22-CR-03 CJW-MAR, 2022 U.S. Dist. LEXIS 218378, at *21 (N.D. Iowa Dec. 5, 2022)(same); *United States v. Martinez*, No. 3:17-CR-257, ECF No. 121 (N.D. Cal. Feb 2, 2023)(adopting the analysis of *Nutter & Jackson*).

*Jackson,* 2022 U.S. Dist. LEXIS 148911). The *Kays* court reasoned that:

> Although the historical record regarding domestic violence prohibitions is problematic, that does not prevent the government from carrying its burden here. Those subject to a domestic violence protective order should logically be denied weapons for the same reasons that domestic violence misdemeanants are. Like § 922(g)(9), § 922(g)(8)'s prohibition is consistent with the longstanding and historical prohibition on the possession of firearms by felons.

*Id*. at *8 (citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). For the reasons explained in greater detail below, this Court should reject the "straightjacket" approach taken by the *Rahimi* court and follow the approach taken by the courts in *Kays, Jordan*, *Jackson* (both of which rejected post-*Bruen* attacks on 18 U.S.C. § 922(g)(8)), and *Jackson*, *Anderson*, *Bernard*, and *Martinez* (all of which rejected post-*Bruen* attacks on the constitutionality 18 U.S.C. § 922(g)(9).

As explained in further detail below, the Second Amendment does not prohibit disarming lawbreakers like the defendant, who are not "law-abiding, responsible citizens." Further, even if those subject to domestic violence protective orders were entitled to protection under the Second Amendment, 18 U.S.C. § 922(g)(8) is consistent with this Nation's historical tradition of firearm regulation.

      A.      **The Second Amendment does not prohibit Congress from disarming lawbreakers**

Persons subject to domestic violence restraining orders are not "law-abiding, responsible citizens" and can therefore be disarmed consistent with the Second Amendment. *Heller, 554 U.S. at 635*. The conduct that leads to a protective order ordinarily constitutes a crime such as assault, battery, or criminal threat. The *Rahimi* court erred in holding that Rahimi could not be disarmed despite his status as a lawbreaker. *Heller* and *Bruen* repeatedly described the Second Amendment right as belonging to "law-abiding" citizens. *Heller*, 554 U.S. at 625, 635; *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. This limitation is consistent both with the Amendment's text and with a long historical tradition of firearm regulation. At the founding, felony offenses could be punished with the death penalty, see *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment), or with forfeiture of one's entire estate, see 4 William Blackstone, Commentaries on the Laws of England 95 (1769); Beth A. Colgan, Reviving the Excessive Fines Clause, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014). Thus, whether directly or indirectly, those who committed serious crimes could be stripped of their right to possess firearms just as they could be stripped of other rights,

such as the right to vote, see *Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967), cert. denied, 389 U.S. 1048 (1968), or to serve on a jury, see Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. Univ. L. Rev. 65, 179 (2003). And some states required firearm forfeiture even upon convictions for misdemeanor offenses involving unauthorized hunting or misuse of a gun.[3]

As lawbreakers, those subject to protective orders can be disarmed—regardless of whether they "automatically lose [their] right to keep and bear arms" or instead "become[ ] eligible to lose it." *Kanter*, 919 F.3d at 453. Understood in context, the Supreme Court's references to "law-abiding" and "responsible" citizens exclude those who have committed serious crimes (such as felonies or dangerous misdemeanors) and who are irresponsible in relation to gun possession (such as minors or the mentally ill). *See Heller*, 554 U.S. at 625-626; *Bruen*, 142 S. Ct. at 2138 n.9. Domestic abusers subject to restraining orders are neither law-abiding nor responsible enough to possess guns. They therefore can be disarmed consistently with the Second Amendment's text and history.

B. **Section 922(g)(8) is consistent with the Nation's historical tradition of firearm regulation**

Even if those subject to domestic violence restraining orders are treated as law-abiding citizens subject to the Amendment's full protection, Section 922(g)(8) is also consistent with the Nation's historical tradition of firearm regulation. Several categories of historical laws support its constitutionality.

First, governments have long been empowered to disarm those who pose a danger to other citizens or to the state. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (observing that the "historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety"). In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they

---

[3] See, *e.g.*, Laws and Ordinances of New Netherland 138 (1868) (1652 law) (firing a gun within the city of New Amsterdam); 1 Complete Revisal of All the Acts of Assembly, of the Province of North Carolina, Now in Force and Use 446-447 (1773) (1768 law) (hunting by non-freeholders); Acts of the General Assembly of the Province of New-Jersey 344 (1776) (1771 law) (trespassing with a gun by non-residents of the colony); 3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, Prefixed 37-38 n* (1897) (1783 law) (storing a loaded gun within Boston); 1 Private and Special Statutes of the Commonwealth of Massachusetts from the Year 1780 to the Close of the Session of the General Court, Begun and Held on the Last Wednesday in May, A.D. 1805 (1805) (1790 law) (possession of a gun on certain islands without permission).

"judge[d] dangerous to the Peace of the Kingdom.'" Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). The later-adopted English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The limitation "as allowed by Law" indicates that this provision did not prevent disarming those who broke the law or posed a danger to others. And, in fact, "[u]se of the Militia Act to disarm dangerous and disaffected persons continued unabated" even after the English Bill of Rights. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405-406 (2019).

Moreover, "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law,'" so long as it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and emphasis omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). In America, at least four colonies or states "codified the existing common law" by adopting statutes that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2144-2145 & n.14.[4] Three of those state laws (all but North Carolina) specifically required forfeiture of the offender's weapons.

Second, many colonies (and later states) disarmed various groups believed to be untrustworthy or potentially dangerous. For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted). And, at the recommendation of the Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states.[5]

---

[4] See 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 law); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament 17 (1771) (1701 law); 1 Laws of the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131-32 (1821) (1741 law); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 law).

[5] See 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of

Third, several American colonies codified the common-law surety system, whereby "any private man [who] hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him" could "demand surety of the peace against such person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769). Two of the "going armed" statutes discussed above (from Massachusetts Bay and New Hampshire) required those who went "armed offensively" to obtain sureties of the peace or of good behavior.[6] And, by 1791, at least five additional jurisdictions had codified or presumed the availability of the common-law surety system.[7]

Although these various categories of laws are not "historical *twin*[*s*]," they nevertheless show that Section 922(g)(8) is "analogous enough" to historical laws "to pass constitutional muster. *Bruen*, 142 S. Ct. at 2133.

*Bruen* explained that "two metrics" are relevant to the analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Section 922(g)(8) imposes no burden on a "law-abiding citizen's" right to self-defense because, as explained above, a qualifying restraining order is ordinarily premised on conduct that constitutes a crime. Section 922(g)(8) imposes only a temporary ban while the person is "subject to" the order. It therefore imposes a burden "comparable" to historical laws that disarmed those who refused to take loyalty oaths or presented a danger to others. *Bruen*, 142 S. Ct. at 2133.

The burdens imposed by Section 922(g)(8) and these statutes are also "comparably justified." *Bruen*, 142 S. Ct. at 2133. Just as historical laws disarmed people based on an actual or perceived threat to individuals or the community, Section 922(g)(8) disarms people subject to restraining orders based on

---

Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

[6] 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 law); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament 17 (1771) (1701 law).

[7] See 2 Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 law); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 law); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 law); 1 General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index, pg. xxx (1840) (1776 Declaration of Rights); 13 Statutes at Large; Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619, pg. 41 (1823) (1789 law).

the threat they pose to others. There is a demonstrated connection between firearms and violence in the domestic-abuse context. "Domestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *United States* v. *Castleman*, 572 U.S. 157, 160 (2014) (citation omitted). Indeed, studies have indicated that, where a gun is in the house, a woman is six times more likely to be killed than other abused women. *Id.* (citing Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, Nat'l Inst. Of Justice J., No. 250 at 16 (Nov. 2003)). Because Section 922(g)(8) and these historical statutes imposes "comparable burden[s]" that are "comparably justified," *Bruen*, 142 S. Ct. at 2133, the former provision is fully consistent with the nation's historical tradition of firearm regulation.

In rejecting these analogues, the Fifth Circuit employed an inappropriately demanding historical test. For example, the Fifth Circuit distinguished historical laws disarming the "dangerous" on the basis that those laws "disarmed people by class or group" rather than based on "individualized findings of 'credible threats' to identified potential victims." *Rahimi*, 2023 U.S. App. LEXIS 2693, at *20–21. But Section 922(g)(8)'s narrow focus means it is even *more* justified than those historical laws. Under the Fifth Circuit's counterintuitive reasoning, legislatures may disarm broad categories of potentially dangerous people but may *not* disarm specific individuals determined to be dangerous after notice and a hearing. In fact, both types of laws are consistent with the Second Amendment's text and history.

The Fifth Circuit also distinguished historical "going armed" laws on the basis that they "disarmed an offender after criminal proceedings and conviction," whereas Section 922(g)(8) "disarms people who have merely been civilly adjudicated to be a threat to another person." *Id*. at *26. This distinction does not matter.[8] Dangerous people can be committed to custody for extended periods based on civil proceedings. See *Kansas* v. *Hendricks*, 521 U.S. 346, 357-360 (1997) (explaining that the Constitution allows the involuntary civil confinement of those rendered dangerous by a mental illness or disorder); 18 U.S.C. 4246 (providing for civil commitment based on mental disease or defect), 4248 (providing for civil commitment of sexually dangerous persons). And this Court in *Heller* endorsed "longstanding prohibitions on the possession of firearms by . . . the mentally ill," *Heller*, 554 U.S. at

---

[8] In the instant case, the defendant is subject to a criminal protective order. *See* Exhibit 1, Redacted Criminal Protective Order-Domestic Violence, GUTHERY_00000049.

626, a group ordinarily disarmed after civil proceedings, see *Hendricks*, 521 U.S. at 357-358. Thus, the civil-versus-criminal distinction should not matter when considering whether historically "going armed" laws are analogous to modern prohibitions such as Section 922(g)(8). See *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (explaining that legislatures can disarm "dangerous people who have not been convicted of felonies").

Finally, despite recognizing that "the *why* behind historical surety laws analogously aligns with that underlying § 922(g)(8) and that "[a]spects of *how* the surety laws worked resemble" § 922(g)(8), the Fifth Circuit said "the analogy breaks down" because surety laws "did not prohibit public carry, much less possession of weapons, so long as the offender posted surety." *Rahimi*, 2023 U.S. App. LEXIS 2693, at *27 (emphasis in original). But the colonial surety laws demonstrate that justices of the peace had broad power to demand "sufficient" guarantees of a threatening person's good behavior and could, in the absence of such guarantees, order the person jailed. Particularly considered in conjunction with other historical laws disarming lawbreakers and dangerous people, the surety laws demonstrate that Section 922(g)(8) is not an "outlier[] that our ancestors would never have accepted." *Id*. (quoting *Bruen*, 142 S. Ct. at 2133).

The Fifth Circuit's reliance on minor distinctions between the historical statutes and Section 922(g)(8) is inconsistent with *Bruen*'s emphasis that its analogical test is not a "regulatory straightjacket" and does not require "a historical *twin*." *Bruen*, 142 S. Ct. at 2133. *Bruen* said that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. Yet the Fifth Circuit distinguished closely analogous historical statutes based on minor and irrelevant distinctions.

Moreover, in contrast to the rigidity of the Fifth Circuit's decision, *Bruen* left room for legislatures to adopt novel regulations addressing "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Id*. And at least two reasons explain why legislatures at the founding might not have adopted statutes exactly like Section 922(g)(8).

First, the historical record shows that "[f]amily and intimate homicides were extremely rare" in

colonial America. Randolph Roth, American Homicide 108 (2009); see id. at 109 ("Marital murders . . . were rare in early modern England and in the Chesapeake and rarer still in New England from colonial times into the nineteenth century."). Moreover, of these family and intimate partner homicides, "only 10 to 15 percent were committed with guns." Randolph Roth, "Why Guns Are and Aren't the Problem," in Jennifer Tucker, et al., A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment 116 (2019).

Those numbers have changed in the modern day. In 2018, at least 1,014 women were killed by their male intimate partners, representing 58% of all women killed by men. Violence Policy Center, When Men Murder Women: An Analysis of 2018 Homicide Data, at 3, https://vpc.org/studies/wmmw2020.pdf. Of those women, 56% were killed with firearms. Id. at 5. The presence of a gun in a house with a domestic abuser increases the risk of homicide sixfold. Castleman, 572 U.S. at 160. And, of course, Section 922(g)(8) is designed to prevent not simply intimate-partner violence against women, but also domestic violence against men and children.

Second, firearms did not present the same threat at the founding because of their technological limitations. The advent of metallic cartridges and inexpensive and ubiquitous repeating firearms led to increased gun use in homicides, including domestic homicides. Id. at 123-127. Along with changed societal concerns such as a rise in homicide rates, these "technological changes" may explain why founding-era legislatures did not enact measures identical to Section 922(g)(8). Bruen, 142 S. Ct. at 2132. In demanding historical analogues virtually identical to Section 922(g)(8), the Fifth Circuit misapplied Bruen.

For the foregoing reasons, the United States continues to request that the Court deny the defendant's Second Motion to Dismiss Indictment.

Dated: March 6, 2023

PHILLIP A. TALBERT
United States Attorney

By: /s/ ADRIAN T. KINSELLA
ADRIAN T. KINSELLA
Assistant United States Attorney