UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| United States of America, | No. 2:22-cr-00173-KJM |
| Plaintiff, | ORDER |
| v. |  |
| Raykheem Andrew Guthery, |  |
| Defendant. |  |

Defendant Raykheem Guthery is charged with possessing ammunition in violation of 18 U.S.C. §§ 922(g)(1) and (8), which apply to those who have previously been convicted of a felony and who are the subject of certain court orders, respectively. *See generally* Indictment, ECF No. 10.  Mr. Guthery moves to dismiss the charges against him for violation of the Second Amendment, and to suppress evidence under the Fourth Amendment.  The court held a hearing on these matters on February 6, 2023.  Mins. Hr'g, ECF No. 44.  Douglas Beevers appeared on behalf of Mr. Guthery, and Adrian Kinsella appeared on behalf of the government. *Id.*  For the reasons below, the court **denies both motions**.

I.      **BACKGROUND**

In the summer of 2022, two Solano County Sheriff's deputies saw a car on the road without license plates and suspected a violation of California Vehicle Code section 5200(a).  Mot.

1  Suppress at 2, ECF No. 33;[1] *see* Reply Mot. Suppress at 1, ECF No. 42; Body Camera Excerpt at

2  0:55, Opp'n Mot. Suppress Ex. 2, ECF No. 39-2;[2] *see also* Cal. Veh. Code § 5200.[3]  After they

3  pulled the car over, Mr. Guthery conceded he was the driver.  Reply Mot. Suppress at 1.  When

4  one deputy asked for identification, Mr. Guthery "claimed not to have identification and gave a

5  false name and date of birth."  *Id.* at 2.  According to the deputies, Mr. Guthery appeared to be

6  intoxicated.  *See id.* at 3.  For example, one deputy wrote in a later report that Mr. Guthery "had

7  slow, slurred speech, and displayed objective signs and symptoms of being under the influence of

8  alcohol and or drugs."  Police Reports Excerpts at 2, Opp'n Mot. Suppress Ex. 1, ECF No. 39-1.

9  The other deputy saw marijuana and a scale through the car's window.  Reply at 2; Police Reports

10 Excerpts at 7.  Mr. Guthery admitted he was "high," Body Camera Excerpt at 3:43, and told the

11 deputies they would find about two pounds of marijuana in the car, *id.* at 5:18.  One of the

12 deputies thus concluded Mr. Guthery also was in violation of California Vehicle Code section

13 23152(f).  Police Reports Excerpts at 3; Body Camera Excerpt at 4:59; *see also* Cal. Veh. Code

14 § 23152(f).[4]

15      The deputies confirmed with dispatch that the person Mr. Guthery claimed to be did not

16 have a valid driver's license, so they suspected he was in violation of California Vehicle Code

17 section 12500.  Police Reports Experts at 2; *see* Body Camera Excerpt at 9:16; *see also* Cal. Veh.

18 Code § 12500.[5]  The deputies arrested Mr. Guthery and found he was carrying a gun and

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

[2] At hearing, defendant agreed the transcript of the body camera excerpt was accurate. The court has reviewed the body camera footage, lodged with the court in DVD format, for accuracy.  *See* Notice of Lodging, ECF No. 37; Acknowledgement of Receipt of DVD, ECF No. 38.

[3] Under California Vehicle Code section 5200(a), "[w]hen two license plates are issued by the department for use upon a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear."  Cal. Veh. Code § 5200(a).

[4] Under California Vehicle Code section 23152(f), "[i]t is unlawful for a person who is under the influence of any drug to drive a vehicle."  Cal. Veh. Code § 23152(f).

[5] Under California Vehicle Code section 12500(a), "[a] person may not drive a motor vehicle upon a highway, unless the person then holds a valid driver's license issued under this code, except those persons who are expressly exempted under this code."  Cal. Veh. Code § 12500(a).

2

1    ammunition.  Body Camera Excerpt at 9:16, 10:07; Reply Mot. Suppress at 2.  Mr. Guthery also

2    possessed more than $600 in cash, in different denominations.  Police Reports Excerpts at 4; *see*

3    Body Camera Excerpt at 11:03.  Deputies found Mr. Guthery's identification card, which led

4    them to believe Mr. Guthery previously had given them a false name.  *See* Body Camera Excerpt

5    at 11:25; *see* Opp'n Mot. Suppress at 3, ECF No. 39.  The deputies then searched the car and

6    found more scales and drugs, including MDMA and LSD.  Police Reports Excerpts at 3–4; Opp'n

7    Mot. Suppress at 4.  The deputies took Mr. Guthery to Solano County Jail and towed the car.

8    Opp'n Mot. Suppress at 4; Police Reports Excerpts at 5; *see also* Cal. Veh. Code § 22651(h).[6]

9        As noted, the U.S. Attorney charged Mr. Guthery with violations of 18 U.S.C.

10   §§ 922(g)(1) and (8), based on his possession of ammunition.  Indictment at 1–2.  Mr. Guthery

11   moves to dismiss the indictment, arguing the charges violate the Second Amendment.  Mot. to

12   Dismiss (MTD), ECF No. 31.  The government opposes, Opp'n MTD, ECF No. 40, and Mr.

13   Guthery has replied, Reply MTD, ECF No. 41.  Mr. Guthery filed a supplemental reply, attaching

14   a recent Fifth Circuit case, *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023), *withdrawn and*

15   *superseded by* 61 F.4th 443 (5th Cir. 2023), *pet. for cert. filed*, No. 22-915 (U.S. Mar. 21, 2023).

16   Suppl. Reply MTD, ECF No. 43.  The court in *Rahimi* held 18 U.S.C. § 922(g)(8) is

17   unconstitutional in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v.*

18   *Bruen*, 142 S.Ct. 2111 (2022).  61 F.4th at 461.  The court provided the government an

19   opportunity to file a supplemental response to discuss the impact of the Fifth Circuit's decision, if

20   any, on this case.  Min. Order, ECF No. 45.  The government responded.  Surreply, ECF No. 46.

21   The court then submitted the matter.

22       Mr. Guthery also moves to suppress evidence under the Fourth Amendment.  Mot.

23   Suppress.  The government opposes, Opp'n Mot. Suppress, and Mr. Guthery has replied, Reply

24   Mot. Suppress.

---

[6] Under California Vehicle Code section 22651(h), a peace officer may remove a vehicle "[i]f an officer arrests a person driving or in control of a vehicle for an alleged offense and the officer is, by this code or other law, required or permitted to take, and does take, the person into custody."  Cal. Veh. Code § 22651(h)(1).

## II.   MOTION TO DISMISS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  Relatively recently, the Supreme Court determined the language of the amendment "confers an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 622 (2008), "the core lawful purpose of [which is] self-defense," *id.* at 630; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010).  The Court has noted, however, that right "is not unlimited."  *Heller*, 554 U.S. at 626.  Instead, it is tempered by "presumptively lawful regulatory measures," *id.* at 627 n.26, including but not limited to "longstanding prohibitions on the possession of firearms by felons," *id.* at 626–27.  In *McDonald*, the Supreme Court held the Second Amendment's personal right to bear arms applied against the states as well as the federal government, but repeated the assurances it made in *Heller*, that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons'" and other persons.  *McDonald*, 561 U.S. at 786 (quoting *Heller* 554 U.S. at 626–27).

Most recently, in striking down New York's public-carry licensing regime, the Supreme Court held "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  *Bruen*, 142 S.Ct. at 2122.  And it "decline[d] to adopt [the] two-part approach" many federal courts of appeals, including the Ninth Circuit, had applied following the Court's decision in *Heller*.  *Id.* at 2126; *see, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).  Under the two-step approach, courts considered "history with means-end scrutiny."  *Bruen*, 142 S.Ct. at 2125.  At step one, the government could "justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood."  *Id.* at 2126 (internal marks and citation omitted).  However, if the historical evidence was inconclusive or suggested the regulated activity was protected, courts moved to step two.  *Id.*  At step two, courts determined the appropriate level of scrutiny depending on whether and to what extent the regulation burdened the "core of the Second Amendment right," i.e., self-defense in the home.  *Id.*  For example, if the regulation burdened the

4

1    core of the Second Amendment right, courts applied strict scrutiny, asking whether the

2    government could show "the law is narrowly tailored to achieve a compelling governmental

3    interest." *Id.* (internal marks and citation omitted).  In rejecting the two-step approach,  the

4    Supreme Court in *Bruen* settled on a new historical test: "When the Second Amendment's plain

5    text covers an individual's conduct, the Constitution presumptively protects that conduct.  The

6    government must then justify its regulation by demonstrating that it is consistent with the

7    Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

8          The court considers each of the two charges against Mr. Guthery under this test and other

9    binding authority.

10         **A.**     **Section 922(g)(1): Possession of Ammunition after Felony Conviction**

11         Under 18 U.S.C. § 922(g)(1), it is unlawful for any person who has been convicted of a

12   felony to possess a firearm or ammunition.  *See* 18 U.S.C. § 922(g)(1).  Mr. Guthery contends this

13   prohibition "violates the Second Amendment as interpreted by [*Bruen*], because in 1787 there

14   was no history of restricting the ammunition possession rights of persons based on prior

15   convictions."  MTD at 1.  The Ninth Circuit has observed, "'the right to possess firearms for

16   protection implies a corresponding right' to obtain the bullets necessary to use them." *Jackson v.*

17   *City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (also noting "*Heller* did not differentiate

18   between regulations governing ammunition and regulations governing the firearms themselves"

19   (citations omitted)).  Assuming that Second Amendment protections extend to possession of

20   ammunition, this court finds the same analysis applies to firearms as ammunition given the

21   coextensive nature of the rights.  *Cf. United States v. Barnes*, No. 22-43, 2023 WL 2268129, at *2

22   (S.D.N.Y. Feb. 28, 2023) (finding defense argument, that "Government must prove that

23   regulation of ammunition passes muster under the historical analysis required by *Bruen*" where

24   defendant is charged with ammunition and not firearm possession, lacked merit).

25         Before *Bruen*, the Ninth Circuit held § 922(g)(1) does not violate the Second Amendment.

26   *See generally United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016).  This court is bound

27   by that decision unless it has been "effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 899

28   (9th Cir. 2003); *see also Head v. Wilkie*, 936 F.3d 1007, 1008 (9th Cir. 2019) (holding district

court not bound by circuit precedent that had been effectively overruled).  "A prior decision is

effectively overruled if intervening higher authority has so 'undercut the theory or reasoning

underlying the prior circuit precedent' as to make the precedent 'clearly irreconcilable' with the

intervening authority." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (quoting

*Miller*, 335 F.3d at 900).  "The clearly irreconcilable requirement is a high standard," and "[i]t is

not enough for there to be some tension between the intervening higher authority and prior circuit

precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent." *Id.*

(citations and quotation omitted).

Mr. Guthery argues *Bruen* is "absolutely inconsistent" with *Phillips*.  MTD at 3.  The

Ninth Circuit has not addressed this argument, but district courts in this Circuit have unanimously

rejected it.[7]  Their reasoning is persuasive.

In *Phillips*, the Ninth Circuit "assum[ed] the propriety of felon firearm bans" under its

own precedent in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), and the Supreme

Court's precedent in *Heller*.  827 F.3d at 1175.  The Circuit reaffirmed its holding that "felons are

categorically different from the individuals who have a fundamental right to bear arms . . . ." *Id.*

at 1174 (quoting *Vongxay*, 594 F.3d at 1115).  In *Heller*, the Supreme Court affirmed the

constitutionality of "longstanding prohibitions on the possession of firearms by felons" and

others.  554 U.S. at 626–27.  The Court did not hold otherwise in *Bruen*.  It invoked *Heller* in

saying the Second Amendment protects the rights of "law-abiding, responsible citizens" to carry

---

[7] *United States v. Barber*, No. 22-00065, 2023 WL 2140526, at *1 (D. Alaska Feb. 21, 2023); *United States v. Jackson*, No. 22-1969, 2023 WL 1965424, at *2 (D. Ariz. Feb. 13, 2023); *United States v. Jackson*, No. 22-37, 2023 WL 1967199, at *3 (W.D. Wash. Feb. 13, 2023); *United States v. Moore*, No. 20-00474, 2023 WL 154588, at *2 (D. Or. Jan. 11, 2023); *United States v. Wondra*, No. 22-00099-BLW, 2022 WL 17975985, at *2 (D. Idaho Dec. 27, 2022); *United States v. Butts*, No. 22-33, 2022 WL 16553037, at *1 (D. Mont. Oct. 31, 2022); *United States v. Carleson*, No. 22-00032, 2022 WL 17490753, at *2 (D. Alaska Oct. 28, 2022); *United States v. Ridgeway*, No. 22-175, 2022 WL 10198823, at *2 (S.D. Cal. Oct. 17, 2022); *United States v. Delpriore*, No. 18-00136, 2022 WL 17490771, at *3 (D. Alaska Oct. 4, 2022); *United States v. Siddoway*, 21-00205, 2022 WL 4482739, at *2 (D. Idaho Sept. 27, 2022); *United States v. Perez*, No. 21-508, 2022 WL 17484969, at *2 (S.D. Cal. Sept. 26, 2022); *United States v. Hill*, No. 21-107, 2022 WL 4361917, at *3 (S.D. Cal. Sept. 20, 2022); *United States v. Nevens*, 19-774, 2022 WL 17492196, at *2 (C.D. Cal. Aug. 15, 2022); *United States v. Ramos*, 21-00395, 2022 WL 17491967, at *5 (C.D. Cal. Aug. 5, 2022).

1    arms.  *Bruen*, 142 S.Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).  One Justice wrote in a

2    concurring opinion that the Court in *Bruen* did not decide "who may lawfully possess a firearm"

3    and did not disturb anything the Court "said in *Heller* or *McDonald* . . . about restrictions that

4    may be imposed on the possession or carrying of guns."  *Id.* at 2157 (Alito, J., concurring).  Two

5    other Justices, joining in the concurrence, also separately reiterated that "[l]ike most rights, the

6    right secured by the Second Amendment is not unlimited" and "[n]othing in [*Bruen*] should be

7    taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at

8    2162 (Kavanaugh, J., concurring; Roberts, J., joining in concurrence).

9         While the Ninth Circuit in *Phillips* did not apply the historical test announced in *Bruen*,

10   the Circuit noted the Supreme Court's recognition of the longstanding prohibitions on possession

11   of firearms by felons.  *Phillips*, 827 F.3d at 1174.  This court finds *Phillips* is not clearly

12   irreconcilable with *Bruen*.  This court is thus bound to find § 922(g)(1) constitutional and deny

13   Mr. Guthery's motion to dismiss the count brought under that subsection.

14        **B.      Section 922(g)(8): Possession of Ammunition after Restraining Order Issues**

15        Mr. Guthery does not specifically address 18 U.S.C. § 922(g)(8) in his motion or reply,

16   but as noted, he filed a supplemental reply citing the Fifth Circuit's recent decision in *Rahimi*,

17   finding § 922(g)(8) unconstitutional.  *See* Suppl. Reply MTD.  The court thus construes Mr.

18   Guthery's motion as including a challenge to § 922(g)(8).  The court allowed the government to

19   file a surreply, which it did, and so the government will not suffer any prejudice if the court takes

20   account of *Rahimi* and considers whether § 922(g)(8) is unconstitutional.

21        Section 922(g)(8) prohibits individuals from possessing firearms or ammunition if they

22   are subject to court orders restraining them from engaging in "conduct that would place an

23   intimate partner in reasonable fear of bodily injury to the partner or child."  18 U.S.C. 922(g)(8).[8]

---

[8] Specifically, the section states in relevant part:

> It shall be unlawful for any person . . . who is subject to a court order
> that--
>
> (A) was issued after a hearing of which such person received actual
> notice, and at which such person had an opportunity to participate;

1   Here, the government asserts that Mr. Guthery is subject to a court order restraining him "from

2   harassing, stalking, or threatening an intimate partner of his, and that by its terms explicitly

3   prohibited the use, attempted use, or threatened use of physical force against such intimate partner

4   that would reasonably be expected to cause bodily injury . . . ."  Indictment at 2; *see* Criminal

5   Protective Order, ECF No. 46-1.[9]  According to a police report the government references, which

6   it provided the defense, Mr. Guthery struck his victim in the face with his fists, threw a plate at

7   her face, struck her again as she fled, and was later convicted of misdemeanor spousal battery.

8   Surreply at 6 & n.3.  Mr. Guthery has not objected to the contents of this report as characterized

9   by the government.

10         The Ninth Circuit appears not to have considered on the merits whether § 922(g)(8)

11   violates the Second Amendment.  *See United States v. Fryberg*, 689 F. App'x 546, 547 (9th Cir.

12   2017) (unpublished) (rejecting defendant's new Second Amendment challenge to § 922(g)(8) on

13   appeal, on grounds there was no plain error because "law in this area is highly unsettled"); *cf.*

14   *Chovan*, 735 F.3d at 1129 (pre-*Bruen*, upholding constitutionality of § 922(g)(9), prohibition on

15   domestic violence misdemeanants from possessing firearms for life).

16         Outside of the Ninth Circuit, a few courts have considered the constitutionality of

17   § 922(g)(8) since *Bruen* was decided.  Some have upheld § 922(g)(8), finding it consistent with

---

> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . .
>
> [to] possess in or affecting commerce, any firearm or ammunition . . . .

18 U.S.C. § 922(g)(8).

[9] The court takes judicial notice of the state court order.  *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("[Courts] may take judicial notice of undisputed matters of public record . . .  including documents on file in federal or state courts.").

8

1   the nation's historical tradition of keeping firearms away from those who are deemed dangerous

2   and in light of the Supreme Court's oft-repeated statement that its Second Amendment holdings

3   should not cast doubt on longstanding restrictions such as those in § 922(g).  *See United States v.*

4   *Jordan*, No. 22-00339, ECF No. 29 at 10 (W.D. Okla. Oct. 25, 2022) ("[T]he historical evidence

5   discussed by the government in its Response demonstrates a tradition in the United States of

6   disarming dangerous citizens."); *United States v. Kays*, No. 22-0040, 2022 WL 3718519, at *3–4

7   (W.D. Okla. Aug. 29, 2022) (finding government satisfied its burden to justify firearm regulation

8   of section 922(g)(8), by pointing to "general historical tradition"); *cf. United States v. Haas*, No.

9   22-5054, 2022 WL 15048667, at *2 & n.1 (10th Cir. Oct. 27, 2022) (unpublished) (not reaching

10   constitutionality of statute given defendant's appellate waiver, but noting as of time of decision

11   § 922(g)(8) had not been deemed unconstitutional.  As some courts observe, colleagues

12   considering the constitutionality of § 922(g)(9) -- the related provision prohibiting firearm

13   possession by domestic violence misdemeanants -- have declined to find that statute

14   unconstitutional post-*Bruen*.  *See, e.g., Kays*, 2022 WL 3718519, at *3 (citing with approval

15   *United States v. Jackson*, No. 22-59, 2022 WL 3582504, at *3 (W.D. Okla. Aug. 19, 2022), which

16   concluded government met burden to justify § 922(g)(9), given that "domestic violence

17   misdemeanants can logically be viewed as 'relevantly similar to felons' who should be 'denied

18   weapons for the same reasons'").[10]

19        Other courts including the Fifth Circuit in *Rahimi* have found § 922(g)(8) is

20   unconstitutional, finding no analogous restrictions among historical firearms restrictions.  *See*

21   *Rahimi*, 61 F.4th at 461 (finding § 922(g)(8) unconstitutional); *see also United States v. Combs*,

22   No. 22-136, 2023 WL 1466614 (E.D. Ky. Feb. 2, 2023) (same); *United States v. Perez-Gallan*,

23   No. 22-00427, 2022 WL 16858516, at *15 (W.D. Tex. Nov. 10, 2022) (same).  Pre-*Bruen*, the

---

[10] *See also United States v. Hammond*, No. 22-00177, 2023 WL 2319321, at *7 (S.D. Iowa Feb. 15, 2023); *United States v. Farley*, No. 22-30022, 2023 WL 1825066, at *3 (C.D. Ill. Feb. 8, 2023); *United States v. Gleaves*, No. 22-00014, 2023 WL 1791866, at *4 (M.D. Tenn. Feb. 6, 2023); *United States v. Martinez*, No. 17-257, ECF No. 121 (N.D. Cal. Feb 2, 2023); *United States v. Bernard*, No. 22-03, 2022 WL 17416681, at *8 (N.D. Iowa Dec. 5, 2022); *United States v. Anderson*, No. 21-00013, 2022 WL 10208253, at *1 (W.D. Va. Oct. 17, 2022); *United States v. Nutter*, No. 21-00142, 2022 WL 3718518, at *8 (S.D.W. Va. Aug. 29, 2022).

1    Eighth Circuit upheld § 922(g)(8) after applying an historical approach to determine whether the

2    statute is consistent with the nation's historical tradition of firearm regulation, finding it is.

3    *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011).  In *Bena*, the Eighth Circuit does not

4    appear to apply the means-end scrutiny the Court later held improper in *Bruen*.  *See id.* at 1182–

5    85.

6            With this review of the case law, the court turns to the analysis required by *Bruen*.  The

7    court first addresses whether § 922(g)(8) regulates conduct protected by the Second Amendment

8    and then addresses whether the government has met its burden to demonstrate § 922(g)(8) is

9    consistent with the nation's history and tradition of firearm regulation.

10           **1.      Section 922(g)(8) Regulates Conduct Protected by the Second Amendment**

11           The government first argues § 922(g)(8) does not burden conduct protected by the Second

12   Amendment because the Second Amendment "protects only the right of law-abiding, responsible

13   citizens to possess firearms for self-defense."  Opp'n MTD at 5–6; *see* Surreply at 4–5.  Thus,

14   "[p]ersons subject to domestic violence restraining orders that satisfy § 922(g)(8) are not law-

15   abiding, responsible citizens who fall within the Second Amendment's protection under *Heller*

16   and *Bruen*."  Opp'n MTD at 6.  Some courts appear to have been persuaded by the government's

17   reasoning in other cases.  *See, e.g.*, *United States v. Ramos*, No. 21-00395, 2022 WL 17491967, at

18   *3 (C.D. Cal. Aug. 5, 2022) (expressing "serious doubts that the plain text of the [Second]

19   Amendment applies to Defendant," who had an underlying non-violent felony); *United States v.*

20   *Nevens*, No. 19-774, 2022 WL 17492196, at *2 (C.D. Cal. Aug. 15, 2022) ("[R]egulations

21   governing *non-law abiding citizens'* use of firearms do not implicate *Bruen* and *Heller*."

22   (emphasis in original)).

23           Some statements in the Supreme Court's recent decisions might suggest some subsets of

24   persons are barred from asserting rights under the Second Amendment.  The Court has repeated,

25   for example, that the Second Amendment protects the rights of only "law-abiding citizens,"

26   *Heller*, 554 U.S. at 625, "responsible citizens," *id.* at 635, "law-abiding members of the

27   community," *McDonald*, 561 U.S. at 790, and "ordinary, law-abiding, adult citizens," *Bruen*, 142

28   S.Ct. at 2134.  In *Bruen*, in a footnote, the Court took pains to say its opinion should not be

                                                    10

"interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" because those regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry [and] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9.

At the same time, the Court in *Bruen* articulates its holding with reference to conduct: "we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. Section 922(g)(8) prohibits individuals subject to a restraining order from engaging in the conduct of possessing firearms and ammunition for any purpose, including self-defense. It thus regulates conduct presumptively protected by the Second Amendment.

### 2.    The Government Meets Its Burden of Showing an Historical Analogue

The court next turns to whether the government has met its burden of showing § 922(g)(8) has an historical analogue given that, under *Bruen*, district courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." 142 S.Ct. at 2131. As a dissenting Justice in *Bruen* astutely observed, district courts are not staffed by historians. *See id.* at 2177 (Breyer, J., dissenting). Nor has the Supreme Court instructed lower courts to survey relevant history sua sponte or retain their own historians as independent experts. Rather, the burden is on the government to demonstrate § 922(g)(8) is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

To determine whether the government has met its burden, the court considers whether it has identified "'historical precedent' from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32. The Supreme Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* at 2132. Rather, it left it to lower courts to determine whether the evidence the government provides in any given case is sufficiently well-established and representative. The Court instructed district courts to consider two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Because

1  "individual self-defense is the *central component* of the Second Amendment right . . . whether

2  modern and historical regulations impose a comparable burden on the right of armed self-defense

3  and whether that burden is comparably justified are '*central*' considerations when engaging in an

4  analogical inquiry." *Id.* at 2133 (emphases in original) (internal marks and citation omitted).

5        The government acknowledges § 922(g)(8) has no "historical twin," likely because

6  historically, domestic violence was treated as a "private matter" and not a societal issue

7  warranting public intervention. *See* Surreply at 2–3; *see also Jackson*, 2022 WL 3582504, at *3

8  ("Legal scholars have commented on the paucity of evidence that American traditions reached

9  within the home to interfere with domestic relationships, particularly the marital relationship.");

10  Joseph Blocher, *Domestic Violence and the Home-Centric Second Amendment*, 27 Duke J. of

11  Gender L. & Pol'y 45, 55–56 (2020) (observing pre-*Bruen*, "[i]n the context of domestic violence

12  prohibitions, the historical record is problematic to say the least"); *see also Nutter*, 2022 WL

13  3718518, at *5 ("The absence of stronger laws may reflect the fact that the group most impacted

14  by domestic violence lacked access to political institutions, rather than a considered judgment

15  about the importance or seriousness of the issue."). Moreover, the government argues, while

16  domestic homicides committed with firearms were rare in the founding era, they are much more

17  common today. *See* Surreply at 10 (citing *United States v. Castleman*, 572 U.S. 157, 159 (2014)).

18  It says technological advances have led to increased use and greater availability of firearms in

19  homicides, including domestic homicides. *See id.* (noting "advent of metallic cartridges and

20  inexpensive and ubiquitous repeating firearms"). Under these circumstances, the government

21  need only "identify a well-established and representative historical analogue, not a historical

22  twin." *Bruen*, 142 S.Ct. at 2133. "So even if a modern-day regulation is not a dead ringer for

23  historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

24  Additionally, the Court has recognized "cases implicating unprecedented societal concerns or

25  dramatic technological changes may require a more nuanced approach." *Id.* at 2132. Such a

26  nuanced approach is appropriate in this case.

27        Viewing the matter through this lens, the government has demonstrated a "long tradition

28  both in England and the United States of prohibiting firearm possession by those who pose a

12

1   threat to the community or to others' safety." Opp'n MTD at 6. The government offers three

2   types of evidence, two of which this court finds sufficient to meet its burden.

3   First, it cites evidence showing "governments have long been empowered to disarm those

4   who pose a danger to other citizens or to the state." Surreply at 5. Specifically, laws predating

5   and continuing after the founding disarmed those the authorities had determined posed a danger

6   to others and the state. For example, in England, "officers of the crown" could seize the arms of

7   those who were deemed "dangerous to the Peace of the Kingdom." Surreply at 5–6 (citing Militia

8   Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662)). And "by the time of American independence,

9   England had established a well-practiced tradition of disarming dangerous persons—violent

10  persons and disaffected persons perceived as threatening to the crown." Opp'n MTD at 6–7

11  (citing Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons*

12  *from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020)). In America, first the colonies and

13  later the states enacted statutes prohibiting the use of arms in a way that spread "'fear' or 'terror'

14  among the people," Surreply at 6 (quoting *Bruen*, 142 S.Ct. at 2145), and "going armed

15  offensively in a threatening manner," Opp'n MTD at 7. These laws reflected a broader concern

16  for the safety and protection of the community as a whole. *See, e.g., Barr*, 919 F.3d at 451

17  (Barrett, J., dissenting) (introducing her dissent by observing "[t]he historical evidence . . .

18  support[s] [the following] proposition: that the legislature may disarm those who have

19  demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the

20  public safety"; proceeding to review a range of precedents including some on which this court

21  does not rely as explained below).

22  Second, the government points to surety laws that required certain individuals to provide

23  adequate assurance before carrying weapons. Opp'n MTD at 7. Such laws allowed individuals

24  "to obtain a 'surety of the peace' when another person posed a threat to his or her safety." *Id.*

25  Failure to provide adequate assurance "in the form of money or guarantees from others" could

26  result in forfeiture of one's weapons or imprisonment. *Id.* In *Bruen*, the Court held these surety

27  statutes were not historical analogues to the New York state law challenged in that case because

28  the statutes did not operate "to prevent law-abiding citizens with ordinary self-defense needs from

1    carrying arms in public for that purpose." *Bruen*, 142 S.Ct. at 2150.  The historical laws "were

2    not bans on public carry, and they typically targeted only those threatening to do harm." *Id.* at

3    2148.  That distinction is meaningful here, and it favors the government's position: unlike the law

4    in *Bruen*, § 922(g)(8) does not totally ban public carry, and unlike the law in *Bruen*, it targets only

5    those who have been found by a court to have threatened harm.

6           While the government also points to evidence of regulations categorically disarming

7    "groups believed to be untrustworthy or potentially dangerous," Surreply at 6, this court declines

8    to rest its decision on these regulations, which included "complete bans on gun ownership by

9    slaves and Native Americans." *Id.* at 6 (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042,

10    1047 (11th Cir. 2022)).  It would be unconscionable to conclude limitations on Constitutional

11    rights based on these categorizations were wise or justified at any point in time, and the court

12    does not understand the government – or any other court pointing to such obsolete codes -- to

13    suggest as much.  It cannot be that historical error in the form of impermissible bias, even if once

14    acceptable among those with political and economic power, could provide the government a

15    continuing license to unfairly discriminate against a group of people, whether it be in restricting

16    Second Amendment rights or any others.  That impermissible bias is intertwined with the

17    historical record raises questions about how properly to interpret that record in drawing

18    conclusions for the present.  *Cf. Rahimi*, 61 F.4th at 457 (finding "utility as historical analogues"

19    of laws "disarm[ing] slaves, Native Americans and disloyal people" to be "dubious, at best").

20    The record here does not allow this court to engage in such a complicated and weighted exegesis,

21    and it need not in order to decide the pending motion.

22           Considering the "how and why" of these historical laws and regulations, as the Supreme

23    Court instructed in *Bruen*, 142 S. Ct. at 2133, leads this court to conclude § 922(g)(8) is

24    analogous to historical restrictions.  As for the "how," the historical regulations cited by the

25    government are analogous to § 922(g)(8) because they allowed the government to disarm

26    individuals based on concerns regarding their threat to the community's safety.  Here, too,

27    § 922(g)(8) permits the government to disarm individuals who are subject to certain court orders

28    designed to protect the community, for the duration of a restraining order, for example.  As for

1   the "why," the cited historical laws and regulations regulated the conduct of those deemed to be a

2   danger to public safety and allowed their dispossession of firearms.  *See generally* Opp'n MTD at

3   6–7; Surreply at 5–7.  Section 922(g)(8) similarly prohibits those who are subject to domestic

4   violence restraining orders—those who, in the government's judgment, threaten the safety of

5   others—from possessing firearms and ammunition.  *Cf. Nutter*, 2022 WL 3718518, at *5 (in

6   determining § 922(g)(9) constitutional post-*Bruen*, finding surety laws "establish that domestic

7   violence was a concern in the founding era, and that laws designed to restrict the rights of those

8   who committed such abuse, and protect the victims, were not viewed as controversial").

9          In reaching this conclusion, the court has considered the Fifth Circuit's decision in

10  *Rahimi*, which found the historical laws and regulations the government advanced were not

11  analogous to § 922(g)(8) because, among other reasons, those laws disarmed those perceived as a

12  threat to society generally and focused on "ensuring the security of the *state*" rather than to

13  protect *individuals* "from the threat of 'domestic gun abuse,'" *Rahimi*, 61 F.4th at 457–59

14  (emphases added), and the surety laws did not impose a comparable burden because they were

15  conditional, partial restrictions on gun possession, whereas § 922(g)(8) is an "absolute

16  deprivation," *id.* at 460.  The Fifth Circuit found nothing in the historical record to serve as an

17  analogue for a provision designed to prevent domestic violence by seizing or preventing the

18  possession of firearms.  This court is not bound by the decision in *Rahimi* and does not find it

19  persuasive.

20         First, the absence of historical laws protecting against the specific threat of domestic

21  abuse reflects "historical attitudes regarding the role of the state in policing violence between

22  intimate partners," and not "historical attitudes regarding firearm regulation."  *See Kelly*, 2022

23  WL 17336578, at *4; *Nutter*, 2022 WL 3718518, at *5.  The Second Amendment does not

24  constrain courts to adhere to outdated or mistaken conceptions of who is presumptively

25  nonviolent and who is violent or dangerous.  Additionally, if the Second Amendment's

26  generalized reference to "arms" refers to ancient and modern weapons alike, *see Bruen*, 142 S.Ct.

27  at 2132, it must also admit modern conceptions of the danger posed by arms.  As one Justice

28  noted in concurrence in *Castlemen*, Congress has "defined 'crime of domestic violence' as a

1   'crime of violence.'" 572 U.S. at 180 (Scalia, J., concurring).  In that case, the Supreme Court

2   saw "no anomaly in grouping domestic abusers convicted of generic assault or battery offenses

3   together with the others whom § 922(g) disqualifies from gun ownership." *Id.* at 167.  Viewed in

4   this properly nuanced way, § 922(g)(8) is analogous to historical regulations disarming

5   individuals deemed a threat to the safety of society as a whole.

6        Second, the Fifth Circuit's opinion in *Rahimi* wrongly rejected an analogy to historical

7   surety laws.  Although that Circuit found "the *why* behind historical surety laws analogously

8   aligns with that underlying § 922(g)(8)," and found "[a]spects of *how* the surety laws worked

9   resemble certain of the mechanics of § 922(g)(8) as well," it found those surety laws were not

10  analogous to § 922(g)(8) because they placed only conditional, partial restrictions on firearm

11  possession whereas § 922(g)(8) is an "absolute deprivation." *Rahimi*, 61 F.4th at 460 (emphases

12  in original).  To the contrary, as the government argues, § 922(g)(8) also imposes a conditional

13  restriction: it criminalizes possession while the individual is subject to a specific, defined

14  restraining order. *See* Surreply at 7; 18 U.S.C. § 922(g)(8) (criminalizing conduct of a person

15  who, present tense, "is subject to a court order").  Nor does § 922(g)(8) impose an absolute

16  deprivation.  Its prohibition is "exceedingly narrow" and is limited to the duration of the

17  restraining order. *United States v. Mahin*, 668 F.3d 119, 125 (4th Cir. 2012) (quoting *United*

18  *States v. Chapman*, 666 F.3d 220, 229 (4th Cir. 2012)).  Mr. Guthery's restraining order, for

19  example, lasted for a period of three years and was in effect at the time of the incident leading to

20  his charge here. *See* Criminal Protective Order.

21       In sum, as the Eighth Circuit explained in *Bena*, in reasoning that appears to have

22  continued force post-*Bruen*, § 922(g)(8) "is focused on a threat presented by a specific category

23  of presumptively dangerous individuals" who jeopardize the community's safety.  664 F.3d at

24  1184.  It disarms individuals who have threatened the safety of an intimate partner or the

25  individual's or partner's child.  While § 922(g)(8) may not have an historical identical twin it is

26  "consistent with a common-law tradition that the right to bear arms is limited to peaceable or

1  virtuous citizens." *Id.*[11]  The government has met its burden of showing § 922(g)(8) is consistent

2  with the nation's history and tradition of firearms regulation.  The court denies Mr. Guthery's

3  motion to dismiss the count under § 922(g)(8).

4  **III.   MOTION TO SUPPRESS**

5        Mr. Guthery also moves to suppress evidence he says was seized in violation of the Fourth

6  Amendment.  Mot. Suppress at 1.  Specifically, Mr. Guthery seeks to suppress 1) all physical

7  evidence seized during the warrantless search and subsequent arrest; 2) all observations of the

8  police during the arrest and search; and 3) all oral statements made by Mr. Guthery following the

9  warrantless detention and subsequent arrest.  *Id.* at 2.

10        A criminal defendant may move to suppress evidence obtained in violation of the Fourth

11  Amendment.  *See United States v. Calandra*, 414 U.S. 338, 341 (1974); Fed. R. Crim. P. 41(h).

12  This prohibition applies to both "direct products of an illegal search—i.e., the physical evidence

13  found during the search itself—and to indirect products of the illegal search—i.e., statements or

14  physical evidence subsequently obtained in part as a result of the search—if they bear a

15  sufficiently close relationship to the underlying illegality."  *United States v. Shetler*, 665 F.3d

16  1150, 1157 (9th Cir. 2011) (citation and internal marks omitted).  Not every Fourth Amendment

17  violation requires the remedy of suppression.  *See Davis v. United States*, 564 U.S. 229, 236–39

18  (2011).  When deciding a motion to suppress, courts first determine whether a Fourth

19  Amendment violation occurred, and then consider whether suppression is appropriate.  *See id.*

20        **A.   Initial Stop**

21        "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

22  Government, and its protections extend to brief investigatory stops of persons or vehicles that fall

23  short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v.*

24  *Ohio*, 392 U.S. 1, 9 (1968)).  "[I]n such cases, the Fourth Amendment is satisfied if the officer's

---

[11]  In reaching this conclusion the court has done its best with the tools at hand, while mindful of Professor Blocher's observation, pre-*Bruen*, that if a "text, history, and tradition" test applies, "courts are likely to . . . conclude that [domestic violence] misdemeanants are relevantly similar to felons, and can be denied weapons for the same reasons," a plainly correct conclusion that nonetheless derives from an "exercise in strained analogies."  Blocher, *supra* p. 12, at 56.

1    action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.*

2    (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Courts "must look at the totality of the

3    circumstances of each case to see whether the detaining officer has a particularized and objective

4    basis for suspecting legal wrongdoing." *Id.* (citation and marks omitted).

5           Here, the court finds the deputies had reasonable suspicion to believe Mr. Guthery

6    violated California Vehicle Code section 5200(a) because they saw his vehicle did not have

7    license plates.  *See* Mot. Suppress at 2; Body Camera Excerpt at 0:55.  The initial traffic stop was

8    lawful.

9           **B.      Arrest**

10          "Under the Fourth Amendment, a warrantless arrest requires probable cause." *United*

11   *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  The Ninth Circuit has held probable cause

12   exists "when under the totality of circumstances known to the arresting officers, a prudent person

13   would have concluded that there was a fair probability that [the defendant] had committed a

14   crime." *Id.* (citation and marks omitted).

15          The deputies had probable cause to arrest Mr. Guthery on two independent grounds.[12]

16   First, Mr. Guthery gave the deputies a false identity, and the person he claimed to be did not have

17   a valid driver's license.  This gave deputies probable cause to arrest him for driving without a

18   valid driver's license in violation of California Vehicle Code section 12500.  *See* Body Camera

19   Excerpt at 9:16 (noting deputies began to arrest Mt. Guthery after informing him "[s]o you don't

20   have a license right now.  You're not supposed to be driving."); *see also Hill v. California*, 401

21   U.S. 797, 802 (1971) (upholding California state court's holding that "[w]hen the police have

22   probable cause to arrest one party, and when they reasonably mistake a second party for the first

23   party, then the arrest of the second party is a valid arrest").

24          Second, Mr. Guthery told deputies, "I'm high right now," a critical admission.  Body

25   Camera Excerpt at 3:43.  As noted, one deputy reported Mr. Guthery "had slow, slurred speech,

---

[12] The government argues deputies had probable cause to arrest Mr. Guthery for "at least three separate offenses."  Opp'n Mot. Suppress at 6.  The court declines to reach the question of whether deputies had probable cause to arrest Mr. Guthery for violating California Health and Safety Code sections 11351 and 11359.

1  and displayed objective signs and symptoms of being under the influence of alcohol and or

2  drugs." Police Reports Excerpts at 2. Another deputy also saw a large amount of marijuana in

3  plain view through the car window. *See id.* at 3:15; Police Reports Excerpts at 7. These

4  circumstances gave the deputies probable cause to arrest Mr. Guthery for driving under the

5  influence of drugs in violation of California Vehicle Code section 23152. Mr. Guthery argues his

6  being under the influence did not prevent him from driving safely, and he cites inconclusive

7  evidence about the effects of marijuana intoxication on driving. *See* Mot. Suppress at 4–5; Reply

8  Mot. Suppress at 5. However, California Vehicle Code section 23152(f) makes it "unlawful for a

9  person who is under the influence of any drug to drive a vehicle." Cal. Veh. Code § 23152(f).

10  The code does not determine the lawfulness of driving under the influence of drugs based on

11  whether a person is able to drive safely. *Cf. United States v. Patzer*, 277 F.3d 1080, 1084 (9th

12  Cir. 2002) (finding under Idaho law, which specifically includes the condition "impairs the

13  driver's ability to safely operate a motor vehicle," officers must have "probable cause to believe

14  the person's ability to drive safely is impaired"). Thus, the question of whether Mr. Guthery was

15  in fact able to drive safely does not factor into whether the deputies had probable cause to believe

16  he was driving under the influence of drugs in violation of California law. Here, they did have

17  probable cause, so the arrest did not violate the Fourth Amendment.

18       **C.**    **Search**

19       A warrantless search is "*per se* unreasonable under the Fourth Amendment—subject only

20  to a few specifically established and well-delineated exceptions." *United States v. Scott*, 705 F.3d

21  410, 416 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "[T]he

22  government bears the burden of showing that a warrantless search or seizure falls within an

23  exception to the Fourth Amendment's warrant requirement." *United States v. Cervante*s, 703

24  F.3d 1135, 1141 (9th Cir. 2012). "When the government fails to carry its burden, . . . all fruits of

25  the Fourth Amendment violation must be suppressed." *United States v. Cole*, 445 F. Supp. 3d

26  484, 488 (N.D. Cal. 2020) (citing *Cervantes*, 703 F.3d at 1142 n.1, 1143).

27       "It is well settled that a search incident to a lawful arrest is a traditional exception to the

28  warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224,

1  (1973).  Such a search may be made of the person and the area within the arrestee's control,

2  including a glove compartment and console.  S*ee id.* at 224.  The deputies here had probable

3  cause to arrest Mr. Guthery, so they did not violate Mr. Guthery's Fourth Amendment right by

4  searching his person after arresting him.  During the search, deputies discovered a firearm and his

5  identification card.

6       Officers may also search a vehicle without a warrant if they have probable cause to

7  believe the vehicle contains contraband or evidence of illegal activity.  *Carroll v. United States*,

8  267 U.S. 132, 149 (1925); *see United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010)

9  ("Under the automobile exception to the warrant requirement, police may conduct a warrantless

10  search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a

11  crime.").  Probable cause is a "belief, reasonably arising out of circumstances known to the

12  seizing officer" that the vehicle contains evidence of illegal activity.  *Carroll*, 267 U.S. at 149.

13  The scope of a warrantless, probable cause-based search is the entire area of the vehicle that

14  might contain the object of the search.  *United States v. Ross*, 456 U.S. 798, 820–24 (1982) (scope

15  of warrantless search "is defined by the object of the search and the places in which there is

16  probable cause to believe that it may be found").  Here, deputies observed two pounds of

17  marijuana and a scale in plain view.  The deputies also discovered a firearm on Mr. Guthery's

18  person, found a large amount of cash in different denominations and learned he had given them a

19  false name.  In these circumstances, the deputies had probable cause to believe they would find

20  contraband or evidence of illegal activity.

21       Even if the deputies did not have probable cause to search the car, the evidence they found

22  in the car would not be excluded if they inevitably would have discovered it while following their

23  routine procedures.  *See Nix v. Williams*, 467 U.S. 431, 443–44 (1983); *United States v. Ramirez-

24  Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).  Here, the deputies towed the car under the

25  authority of California Vehicle Code sections 22651(H) and 22651(P).  Police Reports Excerpts

26  at 5.  Under their routine procedures, the deputies would then have conducted an inventory search

27  of the car, and they would have found the same evidence.  Opp'n Mot. Suppress at 8; *see* Solano

1   County Sheriff's Office Policy 502, Vehicle Towing and Release, Opp'n Mot. Suppress Ex. 4,

2   ECF No. 39-4.

3        The motion to suppress is denied.

4   **IV.    CONCLUSION**

5        For the reasons above, the court **denies the motion to dismiss and motion to suppress**.

6        This order resolves ECF Nos. 31 and 33.

7        IT IS SO ORDERED.

8   DATED:  March 28, 2023.

9

_____
CHIEF UNITED STATES DISTRICT JUDGE